1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

EASTERN DISTRICT OF CALIFORNIA

11
12
13
14

LUIS CALDERON BELTRAN,                1:12-CV-00521 LJO GSA HC

               Petitioner,              FINDINGS AND RECOMMENDATION
                                    REGARDING PETITION FOR WRIT OF
   v.                                  HABEAS CORPUS

15
16

CONNIE GIPSON,

               Respondent.

17

_____/

18
19

      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.

20

**BACKGROUND**

21
22
23
24
25

      Petitioner is currently in the custody of the California Department of Corrections and

Rehabilitation pursuant to a judgment of the Superior Court of California, County of Tulare,

following his conviction by jury trial on August 24, 2010, of first degree murder (Cal. Penal

Code § 187(a)).  (CT[1] 270, 272.)  Petitioner was sentenced to serve an indeterminate term of

twenty-five years to life plus one year. (CT 292-295.)

26

      Petitioner timely filed a notice of appeal.  On December 22, 2011, the California Court of

27
28

[1]"CT" refers to the Clerk's Transcript on Appeal.

1  Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

2  decision.  (See Resp't's Answer, Ex. A.)  Petitioner then filed a petition for review in the

3  California Supreme Court.  On March 14, 2012, the petition was summarily denied.  (See Lodged

4  Doc. No. 5.)

5       On April 2, 2012, Petitioner filed the instant federal habeas petition in this Court.  The

6  petition presents the following grounds for relief: 1) Defendant's waiver of his Miranda rights

7  was not knowing and voluntary; 2) The prosecutor committed misconduct by referring to facts

8  not in evidence; 3) The trial court's admission of lay opinion testimony violated his

9  constitutional rights; and 4) The trial court admitted evidence of prior bad acts and prior jail time

10  in violation of his constitutional rights.  On July 26, 2012, Respondent filed an answer to the

11  petition.  On August 24, 2012, Petitioner filed a traverse.

12                              **STATEMENT OF FACTS**[2]

13       *Prosecution Evidence*

14       Paula Ramos–Hidalgo had been romantically involved with defendant for about
       three years. She was like his wife. They lived in a campsite on a river embankment in
15       Porterville with two tents, a fire pit, two plywood tables, and an outhouse. Paula also
       knew Pedro Meza. They had been friends for about five years. She had never been
16       romantically involved with Pedro, although she did have sex with him on one occasion,
       long before she got involved with defendant.

17
       Paula was four feet eleven inches tall. Paula estimated that Pedro was about five
18       feet nine inches tall, and taller than defendant.

19       *Pedro's Murder*

20       On March 2, 2009,[FN2] at about 6:30 or 7:00 p.m., Paula and defendant were
       making dinner over their fire pit. Paula's face was bruised and scabbed from injuries
21       inflicted by defendant. After they finished eating and their fire was fading, they heard
       whistling from up the embankment. They turned their flashlights and saw Pedro. Pedro
22       came down to their campsite and asked what they were doing. He asked for a pipe to
       smoke his "ice," but they did not have a pipe.[FN3] Pedro asked for at least a piece of
23       aluminum. Paula only had a used piece with grease on it, but she gave it to him. Pedro
       invited them to smoke with him.

24
       FN2. All dates refer to 2009 unless otherwise noted.
25

26       FN3. Detective Camacho testified that "ice" is a form of methamphetamine.

27       [2]The Fifth DCA's summary of the facts in its December 22, 2011, opinion is presumed correct. 28 U.S.C.
28  §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court
   adopts the factual recitations set forth by the Fifth DCA.

After Pedro smoked his drugs, Paula and defendant went into a tent with a candle and sat on the bed. Pedro squatted outside the tent. He said he was coming to pick up Paula and he was going to take her at that moment. He said to her, "I'm going to take you back, but this time it's going to be forever." Paula gave him a serious look and asked him what was going on; did he not know she was having a relationship with defendant. Defendant asked him, "[Don't you] realize that [she is my] woman[?]" Pedro was upset.[FN4] He grabbed Paula's hand and tried to pull her up, but she resisted. Paula said to defendant, "Look, Pappy, what he's doing." Defendant remained calm, pulled Paula toward him, and said, "Hey, guy, calm down because she's my old lady and you will respect her." Pedro made fun of defendant and said, "What can you do to me?" and "What do you think, that you're going to hit me?"

FN4. Paula, however, denied that Pedro mentioned the bruises on her face.

At first, Paula did not take Pedro seriously, but she did when he pulled her forcefully. She realized he was upset, had decided to take her, and thought she would listen to what he was saying. Paula was afraid of both men because she did not know what was going to happen. She was worried how defendant would react. But she was not afraid that Pedro would rape her, nor did she indicate to defendant that she harbored such a fear. At no time did she believe that defendant's life was in danger or that Pedro was going to kill him, but she did think Pedro had come to fight and was physically larger than defendant. [FN5]

FN5. On cross-examination, Paula testified that she initially told the officers that defendant acted in self-defense. She told them that Pedro was there to cause trouble because he came to frighten and show disrespect. And she told them that she was afraid for defendant's safety.

At that point, defendant got up and left the tent. Pedro stood up and followed. After walking a few steps, defendant met defendant, who was returning with a sledgehammer. Defendant struck Pedro's side with the sledgehammer. Paula thought defendant was afraid and was defending his honor, but she did not believe he was in any imminent danger. Pedro did not have time to defend himself. He fell toward defendant and held onto him, but did not go to the ground. Paula covered her head because she was afraid to watch. She knew, however, that defendant struck Pedro about 10 times. She was afraid that she would be hurt too. As defendant struck Pedro, defendant said, "It hurts, right? It hurts, right? ... This happened to you for having been disrespectful to women." Pedro did not respond.

When defendant told Paula he had finished killing Pedro, she saw Pedro on the ground. Defendant seemed frightened. He told Paula to grab some clothing because they needed to leave. He told her to help him bury Pedro, but she refused. About a minute or two after Pedro fell, defendant started burying Pedro. As Pedro felt dirt falling on him, he spoke. He told defendant, "Finish off killing me." Defendant answered, "Well, yes. I am going to finish killing you." Defendant grabbed the sledgehammer and hit Pedro two or three more times in the stomach. Pedro made no further sounds. Defendant put a carpet over Pedro and covered it with more dirt. Paula did not report Pedro's death because she was afraid defendant would do something to her. She did not believe that Pedro's killing was justified.

At 10:00 or 10:30 p.m., defendant and Paula went to Refugio Morales's house because Refugio was defendant's friend and they had nowhere else to go. Defendant was still wearing the same bloody clothes. He told Refugio what had happened and said he wanted to flee to Mexico. He asked Refugio for money, but Refugio did not have any. Defendant changed his clothes and threw the bloody ones in a garbage can.[FN6]

3

FN6. According to Refugio, defendant and Paula came to his house at about 7:00 or 7:30 p.m. that night, before it was dark. Defendant just wanted to talk. He said he wanted to go to Mexico to see his family. He asked Refugio for money to buy beer, but not specifically to go to Mexico. He just said he needed money. Refugio, however, was not working much at the time and did not have any money. The next morning, Refugio, defendant and Paula went to the bakery. Refugio saw defendant carry a tied plastic grocery bag and drop it into a trash can by a house.

*The Following Days*

On March 5, Mario Renteria, who was homeless and had no place to stay, was talking with defendant. Mario had been staying under a bridge, and he asked defendant if he could stay at his campsite that night. Defendant agreed to let him stay at his campsite, so they walked from the bridge toward the campsite, taking all of Mario's personal belongings. When they were about 50 to 100 yards from the campsite, defendant told Mario to stop. Mario did not know why they were stopping, but he overheard defendant tell Paula, "Let's go cover up the boots." Defendant and Paula walked to the campsite down on the embankment, then returned and told Mario he could not stay there. Mario was able to determine the location of the campsite and he returned later to see what they were talking about. When he started cleaning the campsite, he saw boots sticking out of the dirt. As he picked up a boot, he realized it was attached to a leg. Mario walked to a nearby residence and called 911.

When officers arrived at the campsite, they observed Pedro's body, covered with dirt from his ankles up to his neck. His light-colored boots were sticking out of the dirt. Most of his body was covered with a carpet and then a layer of dirt. His head, which was near the fire pit, was partially uncovered and his right arm and hand were fully exposed. Shoe tracks were in the dirt and a small sledgehammer was lying nearby. No blood was apparent on the sledgehammer, and no knife was found at the scene. A video of the crime scene was played for the jury.

On March 6, defendant and Paula saw Benigno Rodriguez. Paula's face was still bruised and scabbed. Defendant told Benigno that he had beaten Paula and caused her injuries. Defendant also told him, in Paula's presence, that Pedro had tried to rape Paula.[FN7] Paula remained quiet because she was afraid to contradict defendant. She was afraid he would say she was taking Pedro's side and she knew he was already thinking of fleeing.

FN7. Paula denied telling Benigno this herself.

The same day, defendant, Paula, Benigno, and a fourth person were taken into custody. When Detective Torres spoke to them at 11:30 a.m., he could smell alcohol from the group, but he could not identify the source of it. Defendant's speech was not slurred. Detective Torres took the group to the police station at 2:30 p.m. and stayed with them until the interviews were concluded later that night. Everyone was fed and allowed to sleep and use the restroom.

*Defendant's Interview*

That night, shortly after midnight, Detective Camacho conducted a video recorded interview of defendant, which was played for the jury. In the interview, defendant explained that he had known Pedro for about two years. When Pedro arrived at the campsite, he smoked his drugs for about 15 or 20 minutes. Defendant offered him food, but Pedro said he just wanted to smoke. Pedro offered to share the drugs, but defendant and Paula declined. When Pedro finished smoking, he started saying he was going to take

4

1
2
3
4
5
6
7

Paula away and defendant was not worth anything. Pedro said he would take Paula by force. Defendant thought Pedro wanted to kill him, rape Paula, and take her away. Pedro pulled at Paula. Defendant told Pedro to calm down. He said Paula was his wife and Pedro should not pull her. Pedro told defendant he was going to take Paula even if she did not want to go. Defendant told him to leave Paula alone. Pedro threatened to kill defendant, saying, "Shut up, son of a bitch, I'm going to kill you so I can take her and you[r] damn dogs too." He said, "I'm going to kill you right now.... I'm going to kill you and I'm going to take her and I'm going to kill your dogs." Pedro told defendant to calm down. Pedro said defendant was worth shit, and he said he was going to kill defendant. Paula said, "[C]alm down, calm down. I don't want nothing to do with you." Pedro was drugged and "all crazy," but defendant had consumed only about half a beer. Pedro removed Paula's shoes and defendant thought Pedro "almost wanted" to rape Paula right there in front of him.

8
9
10
11
12
13
14
15
16

When Pedro took Paula's shoes off, "[t]hat's when [defendant] started getting mad." He "just went and got the [sledgehammer]" from the small tent. It had a steel pipe handle, about 47 inches long. He struck a few blows on Pedro's chest and back with the handle.[FN8] Defendant admitted he might have hit Pedro in the head; he could not see and Pedro may have bent over so that his head got in the way. After the blows, Pedro fell to the ground. Pedro told defendant to finish killing him, saying, "[K]ill me, kill me." Defendant told him, "[Y]ou are going to respect me, son of a bitch—me and my wife." Pedro yelled at defendant, "Kill me fool, you'll see, if not[,] I'm going to kill you if you don't kill me." Because Pedro said this and because "everything had passed already," defendant took a shovel and started throwing dirt on Pedro not even a minute after he fell. Defendant said to Pedro, "[W]hy am I going to kill you? I'll just throw dirt on you like that." Defendant knew Pedro was still alive, but he nonetheless decided to throw the dirt on him. Defendant did not hit Pedro again after he fell; he just left him there. Defendant thought, "If he gets up, well oh well and if he doesn't[,] well...." Pedro stopped moving and his chest did not rise and fall, but defendant did not know if Pedro was still breathing when he buried him. Defendant kept burying him until everything but his feet were buried. Defendant threw the sledgehammer into the river next to the campsite.[FN9]

17
18
19

FN8. Defendant explained that he did not strike Pedro with the small sledgehammer that was at the campsite.

FN9. Detective Camacho later went to the crime scene and waded through the river near the campsite, but could not find the sledgehammer.

20
21
22

During the incident, defendant did not see Pedro with any weapon. Pedro, however, was bigger than defendant and weighed twice as much. Defendant was afraid of Pedro because of what he was saying to him. After beating Pedro, however, defendant was no longer afraid. He was sorry for killing Pedro and thought he may have overreacted. But he did what he could to defend himself. Pedro wanted to kill him.

23
24

Defendant also explained that he killed Pedro because Pedro wanted to rape Paula. Defendant loved Paula very much. Paula did not help defendant kill Pedro, other than giving defendant the shovel.

25
26
27

After burying Pedro, defendant and Paula went to Refugio's house and stayed there. Defendant told his friend, Benigno, what had happened and that he had killed Pedro. The next day, defendant disposed of the clothes he was wearing by throwing them in a trash can. On Thursday, March 5, defendant, Paula, and Benigno went back to the campsite to get some clothes.

28

Defendant admitted he was jealous regarding Paula and he had hit her two weeks

5

ago. Her current bruises were from that incident. He got jealous because some men on the street told him they wanted to do things to Paula. Defendant explained that he and Paula argued and fought a lot. She was aggressive and liked to fight, especially when she drank beer. Defendant would not say how often he hit Paula, but it was not as often as twice a week.

*The Autopsy and Further Investigation*

On March 8, Dr. Walter conducted an autopsy of Pedro's body. He reported that Pedro's body was five feet seven inches long, weighed 195 pounds, and exhibited signs of early decomposition. Pedro was a well-developed and well-nourished 38–year–old man. His blood contained 275 nanograms per milliliter of methamphetamine and 0.20 percent alcohol. A methamphetamine level of 100 nanograms per milliliter or more is considered toxic or poisonous, but heavy users can sometimes tolerate a high level. Methamphetamine can cause euphoria and confidence, or it can cause paranoia and aggression at higher levels. The reaction varies from user to user. A 0.20 percent blood alcohol level can be achieved by drinking 10 beers in one hour. However, decomposition of a body creates artificially high alcohol levels due to the ethanol produced by anaerobic bacteria.

Walter described four lacerations to Pedro's face and forehead, and six to the back of his head, all caused by the skin splitting when it was hit by a blunt object. Many of the lacerations had an elliptical configuration. Pedro's jaw was completely fractured and displaced. Walter believed Pedro's head was struck 11 times.

Walter identified several bruises on Pedro's chest, back, and arms. Walter considered the arm wounds to be defensive. Pedro suffered multiple rib fractures, suggesting he received about four blows to his chest and five or more to his back. Some of his broken ribs were pushed into his lungs. Pedro suffered a kidney laceration and peritoneal hemorrhage, and a subarachnoid hemorrhage in his brain, all due to blunt force trauma. Walter concluded the cause of Pedro's death was multiple blunt force trauma. He believed the injuries were consistent with Pedro's being hit with the edge or handle of a sledgehammer, or with a pipe, baseball bat, or tire iron. His injuries were not consistent with his being hit with a fist.

Detective Meek, who was present for the autopsy, went through Pedro's clothing and personal items, which included about $19, a candy, tissue, and lip balm. Meek did not find a knife on Pedro.

On March 9, Detective Ramos spoke to Paula, who said that Pedro asked her if she wanted to go with him because defendant had beaten her and Pedro saw the bruises on her face. Paula explained, "[He's] going to me, and then he saw how I was, and look how you have her all beat up, all fucked up, and then, like, what happened."

The same day, Detective Torres spoke to Refugio. Refugio said defendant and Paula came to his house on Monday at about 9:00 p.m.[FN10] Refugio told Detective Torres exactly where defendant had disposed of the bag, but Torres learned the garbage had already been picked up.

FN10. We take judicial notice that March 2 was a Monday. (Evid.Code, § 452.)

Criminalist Ken Penner found no hair or blood on the small sledgehammer.

*Defense Evidence*

*Defendant*

Defendant testified on his own behalf. He explained that on March 2, he and Paula had just finished eating when Pedro came to their campsite and started whistling. It surprised defendant because Pedro was not defendant's friend and he never visited them. Pedro came down to the campsite and asked for a pipe or some foil. Defendant and Paula sat in the tent and Pedro was speaking loudly and rudely. He smoked, then asked Paula what the hell she was doing there and why she was living there. He told her he was going to take her. Defendant found this disrespectful because Pedro knew very well that Paula was defendant's woman; Pedro would see them on the streets and he would see that Paula was defendant's lady. Pedro called defendant a "fucker," and told him he was "worth shit" and was "fuck[in'] shit." Pedro said he was going to beat defendant and defendant could not do anything to him. Pedro was serious and mad, and he yelled loudly at defendant. Defendant kept quiet because he was "quite afraid right away." He knew Pedro was bigger, and he thought, "He's going to beat the crap out of me." When defendant told Pedro to calm down, Pedro got angry and told him to "shut the fuck up." Pedro appeared to be getting more and more aggressive. It was clear to defendant that Pedro had come to fight. Defendant was afraid because he knew Pedro could kill him. He did not approach Pedro to fight because Pedro was bigger and he would win. At this point, Pedro got down close to Paula, took her hand, and told her he was going to take her. He started pulling her up. Defendant was afraid of Pedro's size and he was afraid Pedro was going to kill him. Paula told Pedro, "No. I'm not going anywhere. I'm here with my husband here in the—in the house." She said to defendant, "Look at[,] Pappy. Look at what [he's] doing." Paula looked afraid and defendant did not know what to do. He got up and said, "You know, Mami, I'm going to go to the bathroom." Pedro stared angrily at him. Defendant went instead to the small tent where he saw the sledgehammer. When he turned around, Pedro was already walking toward him. Defendant was surprised and scared. Pedro always carried a blade and defendant did not know if he had it now. Defendant again thought, "He's bigger than me, and he's going to beat the crap out of me." Defendant saw in Pedro's face that he was going to come at him, so defendant struck a blow to Pedro's left shoulder. He hit him with the ball and the handle of the sledgehammer. Pedro, who was even angrier now, threw himself at defendant, grabbing him and taking him backward. Defendant threw the sledgehammer and was able to break free from Pedro's grip. Pedro got tangled in the hammock, so defendant retrieved the sledgehammer and struck Pedro in the stomach. This time, Pedro fell to his knees, but he grabbed defendant again. Defendant believed that if Pedro got up, he would kill him. Defendant was very afraid. As Pedro was getting up, defendant struck him again. Pedro tried getting up again and defendant struck him because he feared Pedro would get him. At some point, Pedro remained on the ground. "[W]hen he was already dying," Pedro told defendant, "Kill me or else I'm going to kill you, you fuck[in'] bastard." Defendant still believed Pedro had the ability to kill him. Defendant thought Pedro was bigger, had a lot of strength and power, and was going to get up. Defendant had already hit him several times with the sledgehammer, but he would not calm down.

After burying Pedro, defendant was afraid that Pedro's family would come to kill him, so he told Paula, "Let's go. Let's go to see who can help me to see what we can do." They went to Refugio because he was defendant's only friend.

On cross-examination, defendant testified that he had a couple of sledgehammers. The one he used to kill Pedro he had thrown into the river. It was longer than the one at trial.

Defendant explained that Pedro was being disrespectful to him and to Paula.

Defendant was not offended or angry; he "just kept calm. Quiet." He was "just afraid." He did not know what to do because, as he put it, "[I]f I stood up to him, he was going to fuck me up. I couldn't get mad at him because if I fought him, he was going to fuck me up right there." Defendant was "all afraid already" that Pedro was going to "fuck [him] up right there when [he] was sitting down." Defendant had to defend himself because Pedro was bigger. Defendant went to find a stick or something to make Pedro calm down. Defendant found the sledgehammer, then hit Pedro with it four or five times, but not more than 10 times. When Pedro fell, his head hit a rock next to the fire pit.

Defendant testified that a few months earlier, Pedro had come to his campsite and tried to do things to Paula in front of him. Pedro had taken his pants down. That was the reason defendant knew Pedro did not have good intentions when he came. Defendant conceded that he did not mention this in his recorded interview, but he explained that he talked to the detective later when they walked to the car.

Defendant agreed that after he struck Pedro with the sledgehammer several times and he was "already dying," he said, "Kill me, or I will kill you," and defendant was afraid Pedro was going to kill him. Defendant denied putting dirt on Pedro when he was still alive. Pedro did not appear to be alive and Paula said he was dead.

Defendant explained that Pedro did not hit him, but Pedro was bigger than defendant. That was why defendant got the sledgehammer. He had to defend himself. If he had allowed Pedro to hit him, Pedro would have killed him.

*Benigno Rodriguez*

Benigno Rodriguez testified that Paula never told him Pedro tried to rape her, and he denied telling Detective Camacho that Paula said that.

*Detective Camacho*

According to Detective Camacho, however, Benigno said Paula told him Pedro had tried to rape her. Defendant was present when Paula said this to Benigno.

(See Resp't's Answer, Ex. A.)

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

Cir. 1997), *cert. denied,* 522 U.S. 1008 (1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769

(5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v.

Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's

enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore

governed by its provisions.

II.    Standard of Review

        Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

(2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

        As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

*quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

. . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van

Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

1   Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

2   end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

3   at 126; Moses, 555 F.3d at 760.

4           If the Court determines there is governing clearly established Federal law, the Court must

5   then consider whether the state court's decision was "contrary to, or involved an unreasonable

6   application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, quoting 28

7   U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if

8   the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

9   question of law or if the state court decides a case differently than [the] Court has on a set of

10  materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

11  72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in

12  character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, quoting Webster's Third

13  New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to

14  [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

15  governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

16  clearly established Supreme Court precedent, the state decision is reviewed under the pre-

17  AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

18          "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

19  the state court identifies the correct governing legal principle from [the] Court's decisions but

20  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

21  "[A] federal court may not issue the writ simply because the court concludes in its independent

22  judgment that the relevant state court decision applied clearly established federal law erroneously

23  or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411; see also Lockyer,

24  538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

25  could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

26  Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

27  correctness of the state courts decision, the decision cannot be considered unreasonable.  Id.  If

28  the Court determines that the state court decision is objectively unreasonable, and the error is not

1  structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

2  effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

3       Petitioner has the burden of establishing that the decision of the state court is contrary to

4  or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

5  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

6  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

7  state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

8  Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

9       AEDPA requires considerable deference to the state courts.  "[R]eview under § 2254(d)(1)

10  is limited to the record that was before the state court that adjudicated the claim on the merits,"

11  and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

12  Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state

13  courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v.

14  Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court

15  factual finding is not entitled to deference if the relevant state court record is unavailable for the

16  federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

17  Tamayo-Reyes, 504 U.S. 1 (1992).

18  II.    Review of Claims

19       A.  Miranda Waiver

20       In his first claim, Petitioner alleges his waiver of the Miranda[3] warnings was not

21  knowing, intelligent, and voluntary.  Petitioner asserts that the officer's statement that "whoever

22  is innocent when they come sit in that chair are going to say everything" invalidated his waiver.

23       This claim was first presented on direct appeal to the Fifth DCA.  The Fifth DCA denied

24  the claim in a reasoned decision. (See Resp't's Answer, Ex. A.)  Petitioner then raised the claim

25  to the California Supreme Court in a petition for review.  The California Supreme Court denied

26  the claim without comment or citation of authority.  (See Lodged Doc. No. 5.)  When the

27

28        [3]Miranda v. Arizona, 384 U.S. 436 (1966).

California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the appellate court analyzed and rejected the claim as follows:

> Defendant contends the trial court erred in denying his motion to suppress evidence of his confession because his implied *Miranda* waiver was not voluntary or knowing and intelligent. He explains that Detective Camacho told him before the waiver that "whoever is innocent when they come sit in that chair are going to say everything," insinuating that if defendant chose to exercise his right to remain silent, he would be making a tacit confession of guilt. Defendant says Camacho's statement utilized deception and trickery to imply that when the trier of fact learned that defendant exercised his right to remain silent, it would infer he was guilty. Defendant asserts that he has not forfeited this claim, even though his motion before the trial court did not mention the detective's statement on which he now relies. We conclude defendant's waiver was valid.

> *A. Facts*

> When the recorded interview began, Camacho asked defendant his name. Defendant gave the false name of Luis Perez Flores and a false birth date. Camacho showed him a photograph of himself with his true name, and the following occurred:

> "[CAMACHO]: Who is it [showing defendant his own photograph]?

> "[DEFENDANT]: Well, me.

> "[CAMACHO]: Alright. And why does it say on here that you[r] name is Luis Beltran, not Luis Perez Flores? It says Luis Beltran. Do you see that? Do you know how to read?

> "[DEFENDANT]: Yes.

> "[CAMACHO]: Now let's start straight. What's your name?

> "[DEFENDANT]: Well like that, Luis Beltran.

> "[CAMACHO]: Huh?

> "[DEFENDANT]: Luis Beltran.

> "[CAMACHO]: But do you use Luis Perez Flores every now and then?

> "[DEFENDANT]: Yes, so they won't catch me.

> "[CAMACHO]: Uh-huh. Uh-huh.

> "[DEFENDANT]: (Inaudible) you know why.

> "[CAMACHO]: Okay. Look with all due respect, that's how I like it. That you tell us that we know why because it's true. We already know why. But the reason why we are here is to clear up some stuff okay.

> "[DEFENDANT]: Uh-huh.

"[CAMACHO]: Okay. Alright. Let's clear things up and talk like men because nobody is going to jail for you, nobody. (Inaudible)

"[DEFENDANT]: That's right.

"[CAMACHO]: *So whoever is innocent when they come sit in that chair are going to say everything.*

"[DEFENDANT]: Yes.

"[CAMACHO]: And with everyone that we've talked to, you know what, they already said everything. So the only thing left is to talk to you and with all due respect that is what we are going to do.

"[DEFENDANT]: Yes.

"[CAMACHO]: And, and I hope just like with everything in the world, there are two parts, right?

"[DEFENDANT]: Uh-huh.

"[CAMACHO]: One says this, another says this, and we have to make a decision. Okay.

"[DEFENDANT]: Uh-huh.

"[CAMACHO]: And that's what we are going to help you with today. So everybody can find out why what happened, happened. Okay. So your true name is what so we can be straight between men. It's Luis what?

"[DEFENDANT]: Beltran." (Italics added.)

Following this interchange, Camacho asked defendant several more routine questions about his current address, his marital status, his parents' and sibling's names, his employment, and his gang affiliation.[FN12] Then Camacho read defendant his *Miranda* rights and continued the interview.

> FN12. Miranda admonitions are not required at the preliminary stage of an interview at which police elicit only basic information about the accused that is unrelated to the circumstances of the charged offense. (*People v. Rucker* (1980) 26 Cal.3d 368, 387.)

At trial, defendant argued that his statement was involuntary because Camacho coerced him with both threats and promises of leniency. As for the threats, he explained that Camacho implied to him that everyone had talked and implicated him, that Camacho believed defendant was guilty, and that he was going to jail. The promise arose when Camacho told him there are two sides to every story, suggesting he would not go to jail if he spoke to the police.

Defendant also argued that his waiver of his *Miranda* rights was not voluntary, knowing, and intelligent because he did not expressly waive his rights and because he was intoxicated.

The prosecution argued that defendant was fully advised of his *Miranda* rights and he repeatedly stated that he understood the rights. Thus, his choice to speak to the officers constituted an implied waiver. The prosecution also argued that defendant's

statement was voluntary because there was no coercive police conduct to overbear his will to resist or to force him to confess: the interview was recorded, the officers made no threats or promises, the officers made defendant comfortable, and they did not intimidate or yell at defendant. Further, defendant's consumption of alcohol did not affect the voluntariness of his statement, particularly because he was in custody for many hours before the interview.

The trial court found that defendant was properly read his rights and he acknowledged his understanding of each one. He was not required to expressly waive his rights; his response to the officers' questions constituted an implied waiver. The court further found no evidence that defendant was too intoxicated to understand the questions asked of him or to affect his ability to voluntarily waive his rights. In addition, the court found no evidence of coercion. The court denied the motion to exclude the confession.

*B. Analysis*

Miranda created a set of procedural safeguards intended to protect a criminal suspect's Fifth Amendment right against self-incrimination from the coercive nature of custodial interrogation. (*Miranda, supra,* 384 U.S. at p. 444; *People v. Williams* (2010) 49 Cal.4th 405, 425.) To protect a suspect's privilege against self-incrimination, when the suspect is taken into custody, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (Miranda, supra, at p. 479.) Once a suspect has been given *Miranda* warnings, he or she may knowingly and intelligently waive them and agree to answer questions or give a statement. (*Ibid.*) Statements obtained in violation of these procedural safeguards are inadmissible to prove the suspect's guilt in a criminal case. (*Ibid.; People v. Stitely* (2005) 35 Cal.4th 514, 535.)

Determining whether a *Miranda* waiver was knowing, intelligent, and voluntary has "two distinct dimensions." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citation.] [Citation.]" (*Ibid.*) The prosecution must prove a knowing and voluntary waiver by a preponderance of evidence. (*People v. Whitson* (1998) 17 Cal.4th 229, 248; see *Colorado v. Connelly* (1986) 479 U.S. 157, 168.)

On appeal, we accept the trial court's resolution of disputed facts and inferences and its evaluation of credibility, if supported by substantial evidence, and independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained. (*People v. Whitson, supra,* 17 Cal.4th at p. 248.)

First, our task is to determine whether the statement was voluntary, based on the totality of the circumstances, not on any one particular fact. (See *People v. Williams* (1997) 16 Cal.4th 635, 660–661; see also *Arizona v. Fulminante* (1991) 499 U.S. 279, 285–286.) We must analyze whether the influences brought to bear on defendant were such as to overbear his will to resist, thus bringing about a statement that he did not freely determine. (See *People v. Hogan* (1982) 31 Cal.3d 815, 841, disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.) We evaluate whether the police conducting the interview acted in an oppressive or coercive manner. (See *Colorado v.*

*Connelly, supra,* 479 U.S. at pp. 163–164.)

We have viewed the entire recorded interview and we disagree with defendant's assertion that any coercion occurred. Camacho and the other officer made every effort to make defendant comfortable and at ease. They gave him a soda and removed his handcuffs. They conversed with him in a friendly and matter-of-fact manner, and they gave him a break when he asked for it. The general mood of the entire interview was low-key, calm, and devoid of a coercive atmosphere.

As for Camacho's statement that "whoever is innocent when they come sit in that chair are going to say everything," we cannot ascribe to it the import and meaning defendant proposes. In our opinion, the statement did not suggest that people who are innocent do not invoke their right to remain silent, and that those who do invoke the right are tacitly admitting their guilt. (See *People v. Russo* (1983) 148 Cal.App.3d 1172.) [FN13] Instead, in the context of the entire interview, the statement suggested that Camacho already knew everything because he had already spoken to everyone (whom he now considered innocent) and they had told him everything. He therefore knew what had happened and he knew defendant had done it. He knew defendant was guilty. He just needed to find out why defendant had done it.

FN13. In *People v. Russo, supra,* 148 Cal.App.3d 1172, on which defendant relies, the court explained: "It seems clear from the transcript of the interview that Detective Carlson, despite his denial at trial, must have indicated to Russo prior to the recording of the interview that Russo did not need a lawyer. At the very beginning of the interview when Detective Carlson first began to give Russo his rights, the transcript discloses the statement by Russo, 'But you said I didn't need a lawyer.' Detective Carlson then told Russo he wanted him to be aware of his rights and went on to say to Russo, 'Okay, if you didn't do this, man, you got no, you got no problems. If you didn't do this, you don't need a lawyer, you know.' Thereafter, when asked, having these rights in mind, whether he wished to talk to Carlson, Russo replied, 'I don't know if I should have a lawyer here or what, ...' From the transcript, two issues are presented on appeal: first, whether Russo invoked his right to counsel when he said, 'I don't know if I should have a lawyer here or what ...;' second, whether any waiver of *Miranda* rights was nullified by Carlson's prior statement that 'If you didn't do this, you don't need a lawyer, you know.'" (*Id.* at p. 1175.)
"[R]egardless of whether Russo invoked his right to counsel, any waiver of *Miranda* rights was, under the [then applicable] California reasonable doubt standard, rendered invalid by Detective Carlson's statement at the outset of the interview that, 'If you didn't do this, you don't need a lawyer, you know.' A valid waiver must be knowing and intelligent. [Citation.] After Carlson made the offending statement, Russo repeatedly voiced confusion regarding the right to and need for counsel. Carlson restated and explained the right, but he never retracted the statement that if innocent Russo needed no counsel. The record demonstrates that Carlson misled Russo to believe that his invocation of the right to counsel would be construed as a tacit admission of guilt. Russo was left with little choice but to waive the right to counsel in order, in his mind, to maintain the appearance of innocence. On these facts there could have been no knowing and intelligent waiver." (*People v. Russo, supra,* 148 Cal.App.3d at p. 1177.)

Camacho repeated this strategic motif throughout the interview, reminding defendant that he had already spoken to the others and already knew certain things. For example, when defendant lied to Camacho about his name and birth date, and explained that he sometimes used a false name "so they won't catch me" and "you know why," Camacho agreed, saying: "*We already know why.* But the reason why we are here is to

clear up some stuff okay. [¶] ... [¶] Let's clear things up and talk like men because nobody is going to jail for you, nobody." (Italics added.) Then Camacho told defendant: "And with *everyone that we've talked to,* you know what, *they already said everything. So the only thing left is to talk to you and with all due respect that is what we are going to do.*" (Italics added.) After giving *Miranda* warnings, Camacho said: "And for now, *I know there was a problem* between you and a comrade that you met as Pedro and Pedro ended up dead. Okay. And Pedro's body was found in your campsite. I'm going to show you some pictures and *I already know that it's your campsite. I already talked to your old lady and she already told me.*" (Italics added.) And, when defendant asked who told Camacho he had killed Pedro, Camacho answered, "Who told us that it was you? *Who didn't tell us*—that's a better question." (Italics added .) After Camacho encouraged defendant to tell the truth, he added: "I explained everything to you before we started. *I already told you who we talked to. I already told you more or less the information that I already knew. Now we just need to clear things up okay.* I don't want for us to beat around the bush." (Italics added.)

We observe no coerciveness in this strategy, or in the interview as a whole. We conclude that under the totality of the circumstances, defendant's will was not overborne and his capacity for self-determination was not critically impaired by coercion. His *Miranda* waiver was voluntary.

Second, an examination of the totality of the circumstances also convinces us that defendant's *Miranda* waiver was knowing and intelligent. His rights were read to him one by one, in simple, everyday language. (See *Florida v. Powell* (2010) —— U.S. ——, —— [130 S.Ct. 1195, 1204] [warnings must reasonably convey to suspect his or her rights as required by Miranda]; *People v. Samayoa* (1997) 15 Cal.4th 795, 830 [same].) He expressly stated he understood each of his rights. Then, after responding in this manner to each right, he immediately proceeded to answer Camacho's questions, thereby impliedly waiving his right to remain silent. (*Berghuis v. Thompkins* (2010) —— U.S. ——, —— [130 S.Ct. 2250, 2264] ["a suspect who has received and understood the Miranda warnings, and has not invoked his Miranda rights, waives the right to remain silent by making an uncoerced statement to the police"].) This was sufficient to establish a knowing and intelligent waiver.

In sum, the totality of the circumstances demonstrates a knowing, intelligent, and voluntary waiver. Defendant's claim of *Miranda* error therefore fails.

(See Resp't's Answer, Ex. A.)

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  As to the procedural safeguards to be employed, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id.  With respect to custodial interrogation, the Supreme Court meant "questioning initiated by law enforcement officers after a

1   person has been taken into custody or otherwise deprived of his freedom of action in any

2   significant way." Id. "If the individual indicates in any manner, at any time prior to or during

3   questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the

4   interrogation must cease." Id. at 473-474.

5          In this case, it is undisputed that Petitioner was given appropriate warnings.

6   Nevertheless, Petitioner argues that the interrogating officer invalidated those warnings when he

7   stated to Petitioner prior to giving Petitioner his Miranda warnings that "whoever is innocent

8   when they come sit in that chair are going to say everything." (See Resp't's Answer, Ex. A.) He

9   claims his statement, as a result of the officer's remarks, was not knowing, voluntary, and

10  intelligent.

11         In Miranda, the Supreme Court held that "'[t]he defendant may waive effectuation' of the

12  rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and

13  intelligently.'" Moran v. Burbine, 475 U.S. 412, 421 (1986), quoting Miranda, 384 U.S. at 444,

14  475.  There are two parts to the inquiry.  Edwards v. Arizona, 451 U.S. 477, 482 (1981).  "First,

15  the relinquishment of the right must have been voluntary in the sense that it was the product of a

16  free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver

17  must have been made with a full awareness of both the nature of the right being abandoned and

18  the consequences of the decision to abandon it." Moran, 475 U.S. at 421.  "Only if the 'totality of

19  the circumstances surrounding the interrogation' reveal both an uncoerced choice and the

20  requisite level of comprehension may a court properly conclude that the Miranda rights have

21  been waived." Id., quoting Fare v. Michael C., 442 U.S. 707, 725 (1979); see also North Carolina

22  v. Butler, 441 U.S. 369, 374-375 (1979).

23         In this case, Petitioner does not argue that he was not fully aware of both the nature of the

24  right being abandoned or the consequences of the decision to abandon it.  Rather, he argues that

25  the officer's preliminary statement invalidated his waiver because the statement was coercive.

26  The appellate court reasoned first that the atmosphere was anything but coercive.  The officers

27  made Petitioner feel at ease by removing his handcuffs and offering him a soda.  They conversed

28  in a friendly manner and provided Petitioner with breaks when requested.  The interrogation was

1    conducted calmly without any threats.

2         Nevertheless, Petitioner argues that the statement itself forced him to abandon his rights

3    because that statement suggested that people who are innocent do not invoke their right to remain

4    silent, and those who do are admitting their guilt by doing so.  The state court disagreed with this

5    interpretation of the statement.  The state court determined that taken in the context of the entire

6    interrogation, the statement suggested that the officer had already spoken to everyone, they had

7    told him everything, and he believed they were innocent.  He therefore knew everything that had

8    happened, knew that Petitioner had committed the crime, and merely wanted to know the reasons

9    behind Petitioner's actions.

10        This Court does not find the state court's reasoning to be an unreasonable determination

11   of the facts.  In considering the statement in the context of the entire interrogation, the state

12   court's characterization of the officer's statement is the most reasonable interpretation.  As noted

13   by Respondent, the statement came immediately after Petitioner had blatantly lied about his true

14   name and birth date. (CT 302-303.) Therefore, it is clear that the officer was informing Petitioner

15   that he shouldn't lie because the officer already knew everything.  The same theme was repeated

16   throughout the interrogation when the officer reminded Petitioner that he had already spoken to

17   the others and knew all of the facts already.  Prior to the statement at issue, the officer told

18   Petitioner, "We already know why. But the reason why we are here is to clear some stuff okay."

19   (CT 303.)  Immediately after the statement, the officer stated, "And with everyone they talked to,

20   you know what, they already said everything. So the only thing left is to talk to you and with all

21   due respect that is what we are going to do." (CT 304.)  Later, the officer again informed

22   Petitioner, "I explained everything to you before we started. I already told you who we talked to.

23   I already told you more or less the information that I already knew. Now we just need to clear

24   things up okay." (CT 314.)  In light of the facts, Petitioner's interpretation of the statement is not

25   plausible.  Given the state court's reasonable determination of the context of the statement, the

26   state court reasonably concluded that the statement was not so coercive as to overcome his

27   waiver of his rights.

28        The Court concludes that it cannot be said that no fair-minded jurist would have agreed

18

with the state court's determination.  The state court rejection was not contrary to or an

unreasonable application of Supreme Court precedent. The claim should be rejected.

### B.  Prosecutorial Misconduct

Petitioner next alleges the prosecutor engaged in misconduct by injecting facts not in

evidence when she referred to the victim as a "habitual user" of methamphetamine because it was

part of the homeless "culture."

This claim was also presented on direct appeal to the Fifth DCA where it was rejected in

a reasoned decision. (See Resp't's Answer, Ex. A.)  Petitioner then raised the claim to the

California Supreme Court in a petition for review where it was summarily denied.  (See Lodged

Doc. No. 5.)  Therefore, the Court must "look through" to the last reasoned decision.  Ylst, 501

U.S. at 804-05.  Here, the appellate court rejected the claim as follows:

> Defendant lastly contends the prosecutor committed misconduct by referring to
> facts not in evidence. Specifically, defendant points to the prosecutor's rebuttal argument
> that Pedro was a habitual methamphetamine user and that methamphetamine use is part
> of the culture of homeless people. Defendant asserts that this argument connected back to
> Dr. Walter's testimony that Pedro's symptoms from the high methamphetamine level
> would have been mitigated if he was a habitual user. This inference undermined
> defendant's theory that Pedro was aggressive and defendant feared he would injure Paula
> or defendant. We conclude any error was harmless.

*A. Facts*

> In response to defense counsel's argument that Pedro was aggressive and paranoid
> due to his high level of methamphetamine, the prosecutor argued:

> "Did he have meth in his system? Yes. Did he have an amount of meth that
> showed he was a habitual user? Yes. We warned you ahead of time that we were
> going to bring you people that were homeless and, unfortunately, that's part of that
> culture. [¶] ... [¶] He used meth. In fact, I believe the defendant testified on the
> stand[,] 'I quit using meth. That's why I didn't have a pipe anymore.['] It's
> pervasive. He wasn't kicked out of a house because he used meth. By the way, it
> wasn't a house. It was a riverbed. It was a tent with an outhouse in the back, okay.
> People come. People go. The defendant only lived there for a few months. The
> bamboo wall was already there. The setup was already there. People come and
> people go. That's where we're at. Okay."

*B. Analysis*

> During argument, a prosecutor "is entitled both to discuss the evidence and to
> comment on reasonable inferences that may be drawn therefrom." (*People v. Morales*
> (2001) 25 Cal.4th 34, 44.) "A prosecutor who uses deceptive or reprehensible methods to
> persuade the jury commits misconduct, and such actions require reversal under the federal
> Constitution when they infect the trial with such "'unfairness as to make the resulting
> conviction a denial of due process.'" [Citations.] Under state law, a prosecutor who uses

deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial." (*People v. Cook* (2006) 39 Cal.4th 566, 606.)

If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider how the comments would, or could, have been understood by a reasonable juror in the context of the entire argument, and whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) No misconduct exists if a juror would have taken the remarks to state or imply nothing harmful. (*People v. Benson* (1990) 52 Cal.3d 754, 793.)

Prosecutorial misconduct requires reversal only if it prejudices the defendant. (*People v. Fields* (1983) 35 Cal.3d 329, 363.) Where it infringes upon the defendant's constitutional rights, reversal is required unless the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict. (*People v. Bolton* (1979) 23 Cal.3d 208, 214; *Chapman v. California, supra,* 386 U.S. at p. 24.) Prosecutorial misconduct that violates only state law is cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from the untoward comment. (*People v. Bolton, supra,* at p. 214; *People v. Watson, supra,* 46 Cal.2d at p. 836.) We presume the jury relied on the trial court's instruction on the law rather than on the prosecutor's comments. (*People v. Morales, supra,* 25 Cal.4th at p. 47.)

In our opinion, the prosecutor's comment that Pedro was a habitual methamphetamine user was a logical inference the jurors could properly draw from the evidence. Dr. Walter explained that Pedro's methamphetamine level was almost three times the normally toxic threshold, but that habitual users can tolerate higher levels. From this evidence, it was reasonable to conclude Pedro could tolerate a higher level because he used methamphetamine habitually. We agree, however, that there was no evidence to support the prosecutor's comment that habitual methamphetamine use was part of the homeless culture. Nevertheless, we cannot imagine that it affected defendant's case. The undisputed evidence established that Pedro consumed a large amount of methamphetamine and that defendant and Paula did not. The prosecutor's improper comment that the homeless culture included methamphetamine use did not change those facts. We conclude it was harmless under any standard. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California, supra,* 386 U.S. at p. 24.)

(See Resp't's Answer, Ex. A.)

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).   To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987), *quoting* United States v. Bagley, 473 U.S. 667 (1985).  Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial.  Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The court must keep in mind that "[t]he touchstone of due process analysis

1  in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

2  prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the

3  prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219

4  (1982). "Improper argument does not, per se, violate a defendant's constitutional rights."

5  Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996), *quoting* Jeffries v. Blodgett, 5 F.3d 1180,

6  1191 (9th Cir.1993). If prosecutorial misconduct is established, and it was constitutional error,

7  the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson,

8  507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 ("Only if the argument were constitutional

9  error would we have to decide whether the constitutional error was harmless.").

10      In this case, it is clear that the state court's determination was not contrary to or an

11  unreasonable application of the above standard.  First, the state court reasonably determined that

12  the prosecutor's assertion that the victim was a habitual methamphetamine user was a logical

13  inference that could be drawn from the expert's testimony.  The expert had testified that the

14  victim had a methamphetamine level three times the normal toxic threshold.  (RT[4] 282-283.)  He

15  further testified that habitual users could tolerate higher levels. (RT 284.)  Thus, the prosecutor

16  did not commit misconduct because the argument was a logical inference from the testimony.

17      As to the prosecutor's comment that habitual methamphetamine use was part of the

18  homeless culture, the state court determined that any error was harmless.  The state court's

19  conclusion is not unreasonable.  Even if the prosecutor's statement was erroneous, there is no

20  likelihood it had any effect on the case.  The crux of Petitioner's defense was that the victim had

21  consumed large amounts of methamphetamine and was aggressive as a result, and that Petitioner

22  and Paula had not consumed any methamphetamine.  It was undisputed that the victim had

23  consumed large amounts of methamphetamine, and the prosecutor's assertion that

24  methamphetamine use was part of the homeless culture did not change this fact.  The expert

25  testified that he could not determine what effects such methamphetamine use had on the victim,

26  and the prosecutor's statement had no impact on the expert's conclusion. (RT 284.)  Further, it

27

28
     [4]"RT" refers to the Reporter's Transcript on Appeal.

was undisputed that Petitioner and Paula had not consumed methamphetamine, and the prosecutor's statement did not affect this fact. Therefore, the prosecutor's reference to methamphetamine use as part of the homeless culture could not have had any impact on Petitioner's defense. Accordingly, the state court reasonably concluded that any error due to the prosecutor's statement was harmless. Even if the statement could be considered constitutional error, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. The claim should be rejected.

C. Admission of Lay Opinion Testimony

Petitioner claims his constitutional rights were violated when the trial court: 1) excluded Paula's lay opinion testimony that the victim appeared to have the advantage in the fight; but 2) admitted Paula's lay opinion testimony that Petitioner's response was not justified.

This claim was presented on direct appeal to the Fifth DCA where it was rejected in a reasoned decision. (See Resp't's Answer, Ex. A.) The claim was then raised to the California Supreme Court where it was summarily denied. (See Lodged Doc. No. 5.) Thus, the Court must "look through" to the last reasoned decision. Ylst, 501 U.S. at 804-05. The Court will address each subclaim separately.

1. Opinion as to Advantage in the Fight

The Fifth DCA analyzed and rejected the claim as follows:

> Defendant argues that the trial court committed prejudicial error when it excluded Paula's opinion on whether Pedro would have the advantage in a fight with defendant. Defendant maintains that the primary issue in the case was whether defendant reasonably, or at least honestly, believed that Pedro had so great an advantage that defendant was in fear for his life and needed to take preemptive action against Pedro. Defendant argues that Paula's opinion would have corroborated his own testimony and supported his self-defense/defense-of-others theory. We find any error harmless.

*A. Facts*

> On redirect examination, Paula testified that she did not believe Pedro's killing was justified. Then, on recross-examination, defense counsel elicited the testimony to which defendant refers:

> "[DEFENSE COUNSEL]: I'd like to follow up on that previous line of questioning. Did you tell my investigator that you were scared for [defendant's] safety?

> "[PROSECUTOR]: Objection. Asked and answered.

"THE COURT: Overruled.

"[PAULA]: Yes.

"[DEFENSE COUNSEL]: Is it true that you were scared for [defendant's] safety?

"[PAULA]: Yes.

"[DEFENSE COUNSEL]: Why were you scared for his safety?

"[PAULA]: Because Pedro had more family and so that they fought—if he would injure Pedro or Pedro injure [defendant], that possibly they could come back and fight again with [defendant].

"[DEFENSE COUNSEL]: Did you feel that if [defendant] had not hit Pedro with the hammer, [defendant's] life wouldn't have been in danger?

"[PROSECUTOR]: Objection. Speculation.

"THE COURT: Sustained.

"[DEFENSE COUNSEL]: Were you scared for [defendant's] safety because Pedro was bigger physically?

"[PAULA]: Yes, also.

"[DEFENSE COUNSEL]: Were you scared for [defendant's] safety because Pedro was there to fight?

"[PAULA]: Yes.

"[DEFENSE COUNSEL]: Was it clear to you that Pedro was there to fight?

"[PROSECUTOR]: Objection.

"THE COURT: Overruled.

"[PAULA]: Yes. That's what he went to do. He started assaulting and disrespecting.

"[DEFENSE COUNSEL]: *Were you scared for [defendant's] safety because Pedro had the advantage physically in a fight?*

"THE COURT: That calls for speculation, Counsel. Size alone doesn't give you advantage.

"[DEFENSE COUNSEL]: *Did you believe that Pedro had the advantage in a fight?*

"[PROSECUTOR]: Objection. Relevance.

"THE COURT: Sustained. It's not relevant. Calls for speculation, too.

"[DEFENSE COUNSEL]: Nothing further. Thank you, ma'am." (Italics added.)

1

*B. Analysis*

2

We agree with the trial court that Paula's opinion as to whether *she* believed Pedro
would have the advantage in a fight was not relevant to whether *defendant* harbored an
actual and reasonable belief in the need to defend against an imminent danger of death or
great bodily injury. Thus, we see no abuse of discretion in the trial court's exclusion of the
evidence. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195 [trial court's rulings on relevance
are reviewed for abuse of discretion].)

3

4

5

6

But even if the court erred in excluding Paula's opinion, any error in its exclusion
was harmless under any standard. (*People v.. Watson* (1956) 46 Cal.2d 818, 836;
*Chapman v. California* (1967) 386 U.S. 18, 24.) Defense counsel properly elicited
relevant and objective factors observed by Paula—such as size, aggressiveness, and
behavior. Paula testified that she was afraid for defendant's safety because Pedro was
physically bigger and because Pedro came to fight. The obvious inference from this
testimony was that she thought Pedro might hurt defendant in a fight. This evidence
effectively provided what defendant was seeking from Paula. (See, e.g., *People v. Helton*
(1984) 162 Cal.App.3d 1141, 1146 [any error in excluding evidence was harmless when
it was merely cumulative of properly admitted evidence].)

7

8

9

10

11

(See Resp't's Answer, Ex. A.)

12

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a

13

federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. 62, 68 (1991); Middleton v.

14

Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985); Henry v. Kernan, 177

15

F.3d 1152, 1159 (9th Cir.1999) (admission of evidence in a state trial is not subject to federal

16

habeas review unless it violates a specific constitutional right).  However, there can be habeas

17

relief for the admission of prejudicial evidence if the admission was fundamentally unfair and

18

resulted in a denial of due process. Estelle, 502 U.S. at 72-73; Pulley v. Harris, 465 U.S. 37, 41

19

(1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180,

20

1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th

21

Cir.1990).  The failure to comply with state rules of evidence alone is neither a necessary nor a

22

sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de

23

Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).

24

With regard to the admission of evidence as a violation of due process, the Supreme

25

Court has not squarely decided when the Constitution would overrule a discretionary ruling by a

26

state court.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009) (Supreme Court "has not

27

yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a

28

due process violation sufficient to warrant issuance of the writ").  In this case, Petitioner does not

point to any clearly established Supreme Court precedent that would have required the trial court to rule in his favor and admit the evidence. Absent such "clearly established Federal law," this Court cannot conclude that the state court's ruling was an "unreasonable application." <u>Musladin</u>, 549 U.S. at 77. Therefore, relief is unavailable.

Even so, the state court's determination that the evidence was irrelevant was not unreasonable. As Respondent correctly argues, defense counsel was able to elicit all of the facts surrounding the confrontation relevant to the defense argument that the victim was the aggressor and Petitioner acted in self-defense or the defense of others. As set forth in the colloquy above, defense counsel elicited testimony 1) that Paula was afraid for Petitioner's safety; 2) that Paula was afraid for Petitioner's safety because the victim was physically bigger; 3) that Paula believed it was clear the victim was there to fight; and 4) that the victim began the confrontation by "assaulting and disrespecting." Her conclusion that the victim had the advantage in a fight was cumulative. For the same reason, any error was harmless since all of the evidence on which her conclusion was based was already before the jury. Moreover, the witness's opinion of the victim having an advantage in a fight was completely speculative and irrelevant to whether Petitioner believed he needed to defend himself. Accordingly, the state court rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent. <u>See</u> 28 U.S.C. § 2254(d). The claim should be denied.

2. Opinion as to Justified Homicide

The appellate court rejected this claim as follows:

> Defendant contends the trial court erred by allowing Paula to testify that she did not believe the killing of Pedro was justified. Defendant explains this was tantamount to an opinion that he did not act in self-defense and thus was guilty of a crime. Again, we find any error harmless.

*A. Facts*

> On cross-examination, Paula testified that defendant appeared to be frightened when the fight was over. Within a minute or two, he began putting dirt on top of Pedro. When defendant heard Pedro start talking to him, defendant seemed scared. He grabbed the sledgehammer and hit Pedro. It appeared to Paula that defendant was acting in self-defense.

> On redirect examination, the following occurred:

1
2

"[PROSECUTOR]: All right. Here's my confusion: Pedro is being aggressive. [Defendant] is calm. But you testified to me that [defendant], the calm one, is the one that you were afraid of. Why?

3

"[PAULA]: Not at that moment.

4

"[PROSECUTOR]: Okay. At what moment were you afraid of the defendant?

5
6

"[PAULA]: After what he did or at the moment that he was doing it because I didn't know what to do; whether to run, leave running, or stay there.

7

"[PROSECUTOR]: Okay.

8

"[PAULA]: That's that.

9

"[PROSECUTOR]: So if the defendant was the one that you were afraid of, how can you say that it was self-defense?

10
11

"[PAULA]: Because Pedro was disrespecting him, so what I feared was his reaction.

12
13

"[PROSECUTOR]: So let me just clarify. You were afraid of Pedro or you were afraid of [defendant] when Pedro was telling you he wanted to take you with him because you were afraid of what [defendant's] reaction to that would be?

14

"[PAULA]: Yes. [¶] ... [¶]

15

"[PROSECUTOR]: Were you afraid of Pedro at that time?

16

"[PAULA]: No. [¶] ... [¶]

17
18

"[PROSECUTOR]: What do you mean 'self-defense'? Do you mean that the defendant was physically in danger? [¶] ... [¶] ... [D]o you mean that you were in fear for [defendant's] safety? [¶] ... [¶]

19

"[PAULA]: Well, yes. And mine, too.

20

"[PROSECUTOR]: Okay. And how was that?

21

"[PAULA]: Because I didn't know how he was going to react.

22

"[PROSECUTOR]: He who?

23

"[PAULA]: [Defendant]. [¶] ... [¶]

24

"[PROSECUTOR]: When you said to the defense attorney that it was self-defense, did you mean that [defendant] was defending his honor?

25

"[PAULA]: Yes. [¶] ... [¶]

26
27

"[PROSECUTOR]: I understand that you're saying that [defendant] was defending his honor. But when [defendant] got the hammer, was [defendant] in any [im]minent danger? [¶] ... [¶]

28

"[PAULA]: No.

"[PROSECUTOR]: When you told the defense attorney that you had said to the defendant[,] 'Look, Pappy, what he's doing,' was that when you still thought [Pedro] was joking? [¶] ... [¶]

"[PAULA]: No. [¶] ... [¶]

"[PROSECUTOR]: Okay. So were you calling for help?

"[PAULA]: Well, I don't know what I would call it because he was seeing what Pedro was doing. And then I couldn't do other than look what Pedro's doing.

"[PROSECUTOR]: Okay. I'm trying to think how to ask this question. I'm afraid every way I try is going to be objected to, your Honor.

"*Do you believe that Pedro's killing was justified?*

"[PAULA]: *No. Not that, no.*

"[DEFENSE COUNSEL]: I'm going to object. Calls for conclusion.

"THE COURT: Overruled. She's the one that said it was self-defense. In her mind we're trying to figure out what that means." (Italics added.)

*B. Analysis*

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (Evid.Code, § 800.) This rule "requires that witnesses express themselves at the lowest possible level of abstraction" and, wherever feasible, "'concluding' should be left to the jury." (*People v. Hurlic* (1971) 14 Cal.App.3d 122, 127.) Generally, a lay witness may only testify to facts, leaving it to the trier of fact to draw inferences and conclusions from those facts. (*People v. Williams* (1992) 3 Cal.App.4th 1326, 1332; 1 Witkin, Cal. Evidence (4th ed. 2000) Opn. Evidence, § 1, p. 528.) "'"[A] lay witness may testify in the form of an opinion only when he cannot adequately describe his observations without using opinion wording.'" [Citation.] 'Where the witness can adequately describe his observations, his opinion or conclusion is inadmissible because it is not helpful to a clear understanding of his testimony.' [Citations.]" (*People v. Callahan* (1999) 74 Cal.App.4th 356, 380.) We review a trial court's decision to admit lay opinion testimony for an abuse of discretion. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1254.)

Paula obviously used the terms "self-defense" and "justified" as lay terms, which every reasonable juror would recognize, and she based her use of these terms on the facts she had perceived. However, even if her use of the terms amounted to improper opinion testimony, we conclude any error in the admission of this evidence was harmless under any standard. Paula's personal knowledge of the facts of the incident was fully explored such that admission of her opinion did not affect the outcome. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California, supra,* 386 U.S. at p. 24.)

(See Resp't's Answer, Ex. A.)

As previously stated, the admissibility of evidence is usually a matter of state law not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. at 68.  Nevertheless, habeas

27

relief is available for the admission of prejudicial evidence if the admission was fundamentally

unfair and resulted in a denial of due process. Id. at 72-73; Pulley, 465 U.S. at 41; Walters, 45

F.3d at 1357; Jeffries, 5 F.3d at 1192; Gordon, 895 F.2d at 613.  The failure to comply with state

rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas

relief on due process grounds.  Jammal, 926 F.2d at 919-920.

Nevertheless, with respect to the admission of irrelevant or overtly prejudicial evidence,

the Supreme Court has not squarely decided when the Constitution would overrule a

discretionary ruling by a state court.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009)

(Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

writ").  Absent such "clearly established Federal law," this Court cannot conclude that the state

court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77.  Therefore, relief is

unavailable.

In any case, the state court rejection of the claim was not contrary to or an unreasonable

application of Supreme Court precedent.  The court reasonably determined that the witness used

the terms "self-defense" and "justified" as lay terms based on the facts as she perceived them.

From the colloquy, it is clear the prosecutor was attempting to clarify what the witness meant in

her use of those terms.  The witness's testimony was inconsistent and equivocal.  The

prosecutor's line of questioning was necessary in order to better understand the victim's opinions

in light of the facts.

The state court also reasonably concluded that any error was harmless.  Regardless of the

witness's opinion testimony, all of the relevant facts concerning the confrontation were revealed

through the witness's and Petitioner's testimony.  The jury was fully instructed on Petitioner's

defense theories and was able to properly apply the facts to the law.  The witness's testimony

could not have had a "substantial and injurious effect or influence in determining the jury's

verdict." Brecht, 507 U.S. at 637.  The claim should be denied.

D.   Admission of Prior Act Evidence

In his final claim for relief, Petitioner contends his constitutional rights were violated

when the trial court admitted evidence that 1) Petitioner had committed a prior act of domestic

violence against Paula; and 2) Petitioner had previously spent time in jail.

Like the previous claims, this claim was presented on direct appeal to the Fifth DCA

where it was rejected in a reasoned decision. (See Resp't's Answer, Ex. A.) It was then raised to

the California Supreme Court in a petition for review where it was summarily denied. (See

Lodged Doc. No. 5.) Therefore, the Court must "look through" to the last reasoned decision.

Ylst, 501 U.S. at 804-05. The Court will address each subclaim in order.

### 1. Prior Act of Domestic Violence

In rejecting this claim, the appellate court stated:

> Defendant maintains the trial court erred in admitting evidence that he had beaten Paula about two weeks prior to his police interview. He explains that the court improperly determined the evidence was relevant to show his motive. We disagree.

*A. Facts*

> The prosecution argued that evidence of the domestic violence between defendant and Paula was relevant to defendant's motive to kill Pedro. Defendant got angry when Pedro encouraged Paula to leave the abusive relationship with defendant. At the time of the murder, Paula had visible facial injuries due to being beaten by defendant in the prior week or two. Without this evidence, the prosecution argued, the defense could garner sympathy with the jury on the theory that Pedro was trying to steal defendant's girlfriend when in fact he was trying to remove her from a harmful relationship.

> The trial court found the evidence relevant and determined that its relevance outweighed any prejudice. The court stated: "It seems to me that this goes to the very heart of the case. You've got a defendant who engages in assaultive behavior with his wife on a regular basis. She's in the presence of another man, according to the DA. The victim is trying to get the wife away from the suspect. And in a fit of rage, or maybe defense of her, he beats the—allegedly beats the victim with a sledgehammer."

*B. Analysis*

> Evidence of prior uncharged acts is inadmissible to prove the defendant's bad character, but may be admitted if relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident, among other facts. (Evid.Code, § 1101, subds.(a), (b).) "The categories listed in [Evidence Code] section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence, but ... the list is not exclusive." (*People v. Catlin* (2001) 26 Cal.4th 81, 146.) "[T]he admissibility of other-crimes evidence depends upon the materiality of the fact sought to be proved or disproved, the tendency of the uncharged crime to prove or disprove the material fact, and the existence of any policy requiring exclusion of the evidence. [Citation.] In order to be material, the fact in dispute 'may be either an ultimate fact in the proceeding or an intermediate fact "from which such ultimate fact[ ] may be ... inferred."'" (*Ibid.*) "'The admissibility of other-crimes evidence depends on three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact;

and (3) the existence of any rule or policy requiring the exclusion of relevant evidence, e.g., Evidence Code section 352. [Citations.]' [Citations.]" (*People v. Brown* (1993) 17 Cal.App.4th 1389, 1395.) "Because this type of evidence can be so damaging, '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' [Citation.]" (*People v. Daniels* (1991) 52 Cal.3d 815, 856.)

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole, supra,* 33 Cal.4th at p. 1195.) "'A court abuses its discretion when its ruling "falls outside the bounds of reason."' [Citation.]" (*People v. Catlin, supra,* 26 Cal.4th at p. 122.)

In this case, evidence of defendant's violence against Paula was relevant to defendant's motive to attack Pedro. There was evidence that Paula's injuries were prominently visible, that Pedro was aware defendant had inflicted them, that Pedro reproached defendant for "hav[ing] her all beat up, all fucked up," and that Pedro asked Paula to leave with him because defendant had beaten her. Together, this evidence supported the conclusion that defendant attacked Pedro because Pedro was attempting to rescue Paula from the violent relationship, not because Pedro was planning to kill defendant so he could rape Paula, as defendant claimed. These material facts cast doubt on defendant's assertion that he was justified in preemptively attacking Pedro in defense of himself and/or Paula. The trial court did not abuse its discretion by admitting evidence of defendant's prior violence against Paula, or by determining the evidence was more relevant than prejudicial. The evidence, although prejudicial, was necessary to explain the purpose and dynamic of the incident.

(See Resp't's Answer, Ex. A.)

As previously noted, the admissibility of evidence is usually a matter of state law not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. at 68.  However, habeas relief is available for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Id. at 72-73; Pulley, 465 U.S. at 41; Walters, 45 F.3d at 1357; Jeffries, 5 F.3d at 1192; Gordon, 895 F.2d at 613.  Nevertheless, with respect to the admission of irrelevant or overtly prejudicial evidence, the Supreme Court has not squarely decided when the Constitution would overrule a discretionary ruling by a state court.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009) (Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ").  Absent such "clearly established Federal law," this Court cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77.  Thus, relief is unavailable.

Notwithstanding, the state court determination was not unreasonable.  As discussed by the state court, Petitioner's prior acts of domestic violence went directly to the heart of his

defense theory, as his acts were clearly relevant to motive in this case.  Petitioner's maintained at trial that he acted in defense of Paula because the victim intended to rape her.  The challenged evidence cast doubt on this defense by suggesting that the victim intended to rescue Paula from an abusive relationship.  Without this evidence, the jury would have been without all necessary facts.  Therefore, the state court determination was not contrary to or an unreasonable application of Supreme Court precedent.  See 28 U.S.C. § 2254(d).  The claim should be denied.

2.  Evidence of Jail Time

Petitioner also argued the trial court erred in admitting evidence that Petitioner had previously served jail time.  The appellate court analyzed and rejected this claim as follows:

> Defendant argues that the trial court erred by refusing to strike testimony that defendant had been in jail. We conclude any error was harmless.

*A. Facts*

> When Mario Renteria took the stand, he identified himself, and the following occurred:

> "[PROSECUTOR]: And do you know who that gentleman right there is?

> "THE COURT: Indicating the defendant, for the record.

> "[MARIO]: He was—he was in jail with me for a while.

> "[DEFENSE COUNSEL]: Your Honor, I'm going to object to that and move to strike. [Evidence Code section] 352.

> "THE COURT: Overruled.

> "[PROSECUTOR]: Do you know his name?

> "[MARIO]: I just—I know him by [a] nickname. I didn't know who he was personally."

*B. Analysis*

> Here, even assuming the prejudicial effect of the evidence outweighed any probative value it had (Evid.Code, § 352), we again conclude any error in admission of the evidence was harmless. First, evidence that defendant had been in jail would have come as no surprise to the jurors in light of evidence that defendant beat Paula and had been involved in a long-term turbulent and potentially violent relationship with her. It is highly likely that the jurors assumed his jail time was a result of violence against Paula. Second, there was no evidence to suggest that defendant had a serious criminal past. In fact, in defendant's interview, when Camacho told defendant, "From what I've heard about you, you are a good person. You have a good heart that—," defendant interrupted, "I'm never (inaudible)." To which Camacho responded, "Nope. You're not problematic. You're a hard-worker. You do what needs to be done. You support yourself and you

support your wife and that is all we can do. You are not perfect. We all make mistakes, right?" This discussion suggested that defendant did not have a serious criminal record, had not served prison time, and was finding himself in the situation of having made an isolated mistake. Additionally, there was no evidence that defendant used illegal drugs. Under the circumstances of this case, we believe defendant is merely speculating that the jurors would assume he had been in prison rather than jail, and had committed a crime serious enough to warrant a prison sentence. Third, evidence of defendant's jail term would not have affected defendant's credibility. He not only admitted beating Paula and being very jealous about her, but the extent of harm he inflicted on her was apparent from a photograph in evidence. We cannot conceive that the jurors would have thought less of defendant's credibility because he had been in jail. We conclude any error was harmless under either standard. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California, supra,* 386 U.S. at p. 24.)

(See Resp't's Answer, Ex. A.)

Again, the admissibility of evidence is generally not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. at 68. However, habeas relief is available for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Id. at 72-73; Pulley, 465 U.S. at 41; Walters, 45 F.3d at 1357; Jeffries, 5 F.3d at 1192; Gordon, 895 F.2d at 613. With respect to the admission of irrelevant or overtly prejudicial evidence, the Supreme Court has not squarely decided when the Constitution would overrule a discretionary ruling by a state court. Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009) (Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ"). Absent such "clearly established Federal law," this Court cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77. Relief is unavailable.

In any case, the state court determination was not unreasonable. The court reasonably found that any error was harmless. The state court noted that the jury likely concluded that Petitioner had been in jail due to his prior acts of domestic violence, which facts were already in evidence. It cannot be said that no fair-minded jurist would agree with this determination. Harrington, 131 S.Ct. at 784. Moreover, any damage caused to Petitioner's credibility by the introduction of this statement would have been inconsequential. Petitioner's credibility was undermined by his own testimony, Paula's testimony, Dr. Walker's testimony, and the autopsy results. The state court rejection of this claim was not contrary to or an unreasonable application

of Supreme Court precedent.  <u>See</u> 28 U.S.C. § 2254(d).  The claim should be rejected.

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH PREJUDICE.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:    September 17, 2012**              **/s/ Gary S. Austin**
                                             UNITED STATES MAGISTRATE JUDGE